# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**<br>1333 North Oracle Road<br>Tucson, AZ 85705;<br><br>**PUBLIC EMPLOYEES FOR<br>ENVIRONMENTAL RESPONSIBILITY**<br>2000 P Street NW, Suite 240<br>Washington, DC 20036;<br><br>**and**<br><br>**PROJECT GUTPILE**<br>an unincorporated association<br>in Santa Barbara, California;<br><br>          Plaintiffs,<br><br>   vs.<br><br>**LISA P. JACKSON**, Administrator,<br>Environmental Protection Agency<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460;<br><br>**ENVIRONMENTAL PROTECTION AGENCY**,<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460;<br><br>          Defendants. | Case No.:<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

# INTRODUCTION

1. Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, and PROJECT GUTPILE (collectively "Plaintiffs") bring this civil action pursuant to 15 U.S.C. § 2620(b)(4)(B), for de novo review of a final decision by Federal Defendants LISA P. JACKSON, Administrator of the Environmental Protection Agency and the ENVIRONMENTAL PROTECTION AGENCY (collectively "the EPA") to deny Plaintiffs' petition to initiate a rulemaking proceeding under the Toxic Substances Control Act ("TSCA") to prohibit the manufacture, processing, and distribution in commerce of lead shot, bullets and fishing sinkers ("Petition").

2. TSCA grants the EPA the broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601. The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances. The EPA has already declared that lead is a toxic substance, and although it has implemented some regulations to reduce lead exposure, lead still remains widely encountered by wildlife and distributed in the environment from spent lead ammunition and lost lead fishing tackle.

3. Because of the unreasonable risk posed by lead ammunition and fishing tackle, the availability of alternatives, and the EPA's authority to regulate those substances, on August 3, 2010, Plaintiffs submitted a Petition to initiate rulemaking pursuant to TSCA Section 21 to regulate lead in bullets, shot, and fishing tackle.

4. On August 27, 2010, the EPA sent a letter to Plaintiffs indicating it was denying the "portion" of the petition dealing with lead shot and bullets. On September 24, 2010, the EPA published in the Federal Register its reasons for denying the Plaintiffs' request to regulate lead shot and bullets – citing a lack of authority due to an exclusion found at TSCA § 3(2)(B)(v).

5. In a November 4, 2010, letter to the Plaintiffs, the EPA announced it had "completed its review of [Plaintiffs'] August 3, 2010, petition requesting that the Agency

take action under the Toxic Substances Control Act (TSCA) to prohibit the manufacture, processing, and distribution in commerce of lead shot, bullets, and fishing sinkers." In this November 4 letter, EPA stated it was denying the Plaintiffs' request to regulate fishing sinkers.

6. On November 17, 2010, the EPA published in the Federal Register its reasons for denying the request to regulate lead fishing tackle claiming that Plaintiffs' did not demonstrate a rule banning lead fishing sinkers is necessary and did not demonstrate that the requested action is the least burdensome alternative.

7. As set forth below, the EPA wrongfully denied the Petition.  The EPA has the authority to regulate lead in shot, bullets, and fishing sinkers, and the Petition clearly demonstrates that the requested regulation is necessary to protect against an unreasonable risk of injury to health or the environment.  Therefore, Plaintiffs ask that the Court order the EPA to develop and implement regulations to prevent the poisoning of wildlife from spent lead bullets and shot and lost lead fishing sinkers.

## JURISDICTION AND VENUE

8. This Court has jurisdiction in this matter pursuant to 15 U.S.C. § 2620(b)(4)(A), which explicitly grants jurisdiction to district courts of the United States to review denials of Section 21 petitions submitted under TSCA.

9. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e), because the Defendant resides in this district and a substantial part of the events and omissions which gave rise to this action occurred in this district.

## PARTIES

10. Plaintiff Center for Biological Diversity ("Center") is a non-profit 501(c)(3) corporation with offices in San Francisco, Joshua Tree, and Los Angeles, California; Phoenix, Flagstaff, and Tucson, Arizona; Pinos Altos, New Mexico; Portland, Oregon; Seattle, Washington; Anchorage, Alaska; and Washington, D.C.  The Center works throughout the United States and the world to protect endangered species and wild places through science, policy, education, citizen activism, and environmental law.

11. The Center and its 42,000 members have an ongoing interest in protecting wildlife from lead poisoning. Center members and staff observe, research, study, and seek protections for the wildlife species that are vulnerable to lead poisoning by lead bullets, shot, and sinkers, and intend to continue to do so in the future. The Center's members and staff derive scientific, recreational, conservation, and aesthetic benefits from these species' existence in the wild and these benefits will be harmed by the damage to wildlife by lead bullets, shot, and sinkers. Since 2004, the Center has taken action through its "Get the Lead Out" campaign to change policies in order to prevent toxic lead from entering the food chain. The Center has been a leading proponent of regulations on lead ammunition to protect endangered California condors, bald and golden eagles, and other wildlife species at risk from lead poisoning. The Center co-authored the Petition and brings this action on its behalf and on behalf of its adversely affected members and staff.

12. Plaintiff Public Employees for Environmental Responsibility ("PEER") is a 10,000 member national alliance of local, state and federal resources professionals working to protect the environment. PEER members include government scientists, land managers, environmental law enforcement agents, field specialists, and other resource professionals committed to responsible management of America's public resources. PEER members engage in wildlife-related recreation, including hunting, fishing, and wildlife observation. PEER members also have professional responsibilities for the management and study of wildlife. These recreational and professional interests are harmed by the damage to wildlife caused by lead shot, bullets, and fishing sinkers. PEER co-authored the Petition and brings this action on its behalf and on behalf of its adversely affected members and staff.

13. Plaintiff Project Gutpile is an educational organization comprised of hunters that provides educational resources for lead-free hunters and anglers. Project Gutpile members observe, research, study, and seek protections for the wildlife species that are vulnerable to lead poisoning by lead bullets, shot, and sinkers, and intend to

continue to do so in the future.  Project Gutpile's members and staff derive scientific, recreational, conservation, and aesthetic benefits from these species' existence in the wild and these benefits will be harmed by the damage to wildlife by lead bullets, shot, and sinkers.  Project Gutpile has been promoting non-lead ammunition and raising lead awareness in the hunting community since 2002.  Project Gutpile co-authored the Petition and brings this action on its behalf and on behalf of its adversely affected members and staff.

14. The continued poisoning of wildlife due to lead bullets, shot, and fishing sinkers existing in the environment, unabated because of Defendant's refusal to enact regulation in response to Plaintiffs' Petition, harms the wildlife species that Plaintiffs, their members, and staff observe, research, study, and seek to protect.  Plaintiffs' scientific, recreational, conservational, and aesthetic enjoyment of these species and their habitats are thus harmed by EPA's refusal to take action pursuant to the Petition. Plaintiffs' members and staff include individuals with varying interests in the protection of wildlife, ranging from scientific, professional, and educational to recreational, aesthetic, moral, and spiritual interests.  Further, Plaintiffs' members and staff have visited and intend to visit in the future those areas inhabited by wildlife.  Plaintiffs' members and staff utilize, on an on-going basis, the biological, scientific, research, education, conservation, recreational and aesthetic values of the habitats of lead-affected wildlife.

15. Plaintiffs' staff and members observe and study wildlife affected by lead and derive professional, scientific, educational, recreational, aesthetic, inspirational, and other benefits from these activities and have an interest in preserving the possibility of such activities in the future.  An integral aspect of Plaintiffs' members' use and enjoyment of wildlife impacted by lead is the expectation and knowledge that the species can exist in healthy, sustainable populations in the wild.

16. Defendant Lisa P. Jackson, Administrator of the Environmental Protection Agency, is the highest ranking official within the Environmental Protection

Agency and, in that capacity, has the duty and authority to administer TSCA. She is sued in her official capacity.

17. Defendant Environmental Protection Agency is the federal agency charged with implementing TSCA.

## STATUTORY BACKGROUND

18. After finding "that human beings and the environment are being exposed each year to a large number of chemical substances and mixtures" including "some whose manufacture, processing, distribution in commerce, use or disposal may present an unreasonable risk of injury to health or the environment," Congress enacted TSCA and assigned its administration to the EPA. 15 U.S.C. § 2601(a).

19. Under Section 21 of TSCA, any person may petition for a rule, and such a petition must set forth facts that establish the requested action is necessary.

20. TSCA mandates that the EPA must regulate chemical substances where there is a "reasonable basis to conclude" that such substances "present an unreasonable risk of injury to health and or the environment." 15 U.S.C. § 2605(a). In evaluating unreasonable risk the EPA must consider: A) the effects of the chemical on health and the magnitude of human exposure; B) the effects of the chemical on the environment and the magnitude of environmental exposure; C) the benefits of the chemical for various uses and the ability of substances for such uses; and D) the reasonably ascertainable economic consequences of the rule, after consideration of the effect on the national economy, small business, technological innovation, the environment, and public health. 15 U.S.C. § 2605(c)(1).

21. Factual certainty of the magnitude of the risk to health and the environment is not required. The EPA may base its decision not only on known facts, but also on scientific theories, projections and extrapolations from available data, and modeling using reasonable assumptions. H.R. Rep. No. 1341, 94th Cong., 2d Sess. 32 (1976).

22. TSCA authorizes the EPA to prohibit "the manufacturing, processing, or distribution in commerce" of a chemical substance for a particular use or uses. 15 U.S.C. § 2605(a)(2)(A)(i).

23. Lead used in shot, bullets, and fishing sinkers are "chemical substances" falling within the regulatory scope of TSCA. Except as provided in subparagraph (B), the term "chemical substance" means "any organic or inorganic substance of a particular molecular identity, including (i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature and (ii) any element or uncombined radical." 15 U.S.C. § 2602(2)(A).

24. It is indisputable that lead is a chemical substance. Most other uses of lead, such as lead-based paints, plumbing pipe and fixtures, and leaded gasoline, are already subject to strict regulation. In January 2008, EPA added lead and lead compounds to its Priority Testing List, requiring certain manufacturers to submit unpublished health and safety reports to the EPA. 40 C.F.R. 716.120. Automobile wheel balancing weights will be phased out with an EPA proposed rule scheduled for 2011. Manufacturers of consumer products intended for use by children who also manufacture lead or lead compounds are required to report certain health and safety data to the EPA. However, there is still currently no specific regulation of lead shot, bullets, and fishing sinkers under TSCA.

25. Certain chemical substances are excluded from the definition of "chemical substances" for the purpose of regulation under TSCA. "Any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986" is excluded from regulation under TSCA. 15 U.S.C. § 2602(B). Section 4181 of the Internal Revenue Code establishes excise taxes for shells and cartridges. 26 U.S.C. § 4181.

26. Shells and cartridges are manufactured products that consist of several component parts, *inter alia* shot and bullets, that are themselves separately manufactured

and sold and then assembled together to make ammunition.  Shells and cartridges are not defined under TSCA.

27. The Internal Revenue Service has clarified items that are not included as part of the excise tax of shells and cartridges.  In 1968, eight years prior to the passage of TSCA, the Internal Revenue Service in a Revenue Ruling stated, "The manufacturers excise tax imposed upon sales of shells and cartridges by section 4181 of the Internal Revenue Code of 1954 *does not apply* to sales of separate parts of ammunition such as cartridge cases, primers, bullets, and powder." IRS Rev. Rul. 68-463, 1968-2 C.B. 507 (emphasis added).  This ruling has been confirmed by subsequent administrative decisions. (*See*, for example, Fed. Tax Coordinator ¶ W-2911(2d.)).

28. This IRS ruling, along with the legislative history of TSCA, makes clear that the component parts of ammunition, namely shot and bullets, may be regulated as chemical substances under TSCA.

29. The House legislative committee responsible for authoring TSCA makes clear that it intended that the EPA regulate components in ammunition:

> Although the language of the bill is clear on its face as to the exemption for pistols, revolvers, firearms, shells, and cartridges, the Committee wishes to emphasize that it does not intend that the legislation be used as a vehicle for gun control. Consequently the Administrator has no authority to regulate ammunition as an unreasonable risk because it injures people when fired from a gun. However, the Committee does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical properties.

30. The Senate Report of TSCA also indicates that it intended EPA regulate components in ammunition, noting under TSCA that while "chemical substance" does not include ammunition, it is only "to the extent subject to taxes imposed under § 4181 of the Internal Revenue Code."

31. Section 21 of TSCA provides for citizen's petitions which may request that the EPA initiate proceedings to issue, amend, or repeal rules promulgated under TSCA. 15 U.S.C. § 2620(a).  The Administrator shall either grant or deny the petition

within 90 days.  If the Administrator grants the petition, the Administrator shall promptly commence an appropriate proceeding.  If the Administrator denies the petition, the Administrator shall publish in the Federal Register the reasons for the denial.  If such a petition is denied, the petitioner may bring a civil action in a district court and is entitled to a de novo judicial review of the entire petition. 15 U.S.C. § 2620(b)(4)(A)-(B).

## FACTUAL BACKGROUND

**A. Toxicity of Lead**

32.     Lead is toxic to organisms, even at very low levels, and has lethal and sublethal effects at higher levels.  It is a cumulative metabolic poison affecting a large number of biological functions including reproduction, growth, development, behavior and survival.  Even low levels of exposure to lead can cause neurological damage, and there may be no safe level of lead in the body tissues of fetuses and young.  Despite this knowledge, lead continues to be used in manufactured products, many of which are sources of toxic lead exposure to wildlife and to human beings.

33.     Lead ammunition is used in hunting and may directly or secondarily expose wildlife to lead, and deposit bioavailable lead into the environment.  Despite the ban on lead shot for waterfowl hunting, large amounts of spent lead ammunition continue to be deposited in the environment through hunting of big game, upland species, furbearers, and from predator control activities.

34.     Significant amounts of lead end up in aquatic environments from lost or discarded fishing tackle, including lures, sinkers, weights, and a variety of fishing traps and nets.  The EPA estimated in 1994 that 450 million toxic fishing sinkers containing lead or zinc are produced each year and potentially entering the environment.

35.     There is extensive documentation showing that lead shotgun pellets and lead fishing tackle accumulate in both aquatic and terrestrial habitats, where animals encounter and ingest these lead items, often mistaking them for food, grit or bone fragments.  More than 130 species of animals (including mammals, upland birds, raptors, waterfowl, amphibians and reptiles) have been reported in scientific literature as being

exposed or killed by ingesting lead shot, bullets, bullet fragments, fishing tackle or prey contaminated with lead ammunition.

36. Particularly susceptible are avian scavengers that encounter lead in carcasses left in the wild, in gut piles (viscera) from animals cleaned in the wild, and in wounded prey species that survive hunting and carry lead ammunition in their bodies. Sensitive species such as bald and golden eagles and endangered California condors are frequently killed by lead poisoning or suffer chronic sublethal effects of lead poisoning from scavenging meat containing lead fragments from ammunition.

37. Ducks, geese and swans have received protection from hunting sources of lead poisoning since 1991 by a federal requirement to use only nontoxic shot for hunting waterfowl, but similar restrictions in terrestrial habitats are scattered and localized. Data now show that over 75 terrestrial species of birds are known to be poisoned by spent lead from ammunition.  Mourning doves are particularly susceptible to ingesting lead shot pellets, and lead poisoning may kill as many as 20 million doves per year in the United States.  Lead fishing sinkers and jigs continue to cause the needless deaths of waterfowl species such as trumpeter swans, ducks, geese and loons.

38. Lead can act as a neurotoxin, and numerous studies indicate that blood lead concentrations even below 10 micrograms per deciliter can have adverse developmental effects on intellectual functioning and social-behavioral conduct in humans.  Human fetuses and young children are particularly sensitive to even low levels of lead exposure and can easily suffer permanent neurological damage.  Clinicians now assert there is no safe level of lead in the body tissues for fetuses and young children.

39. Hunters who use lead bullets are at risk of lead poisoning in several ways.  One exposure mechanism is inhalation of airborne lead created by friction from lead slugs against the gun barrel, whereby inhaled lead enters the bloodstream.  Hunters are also exposed to lead residue ingestion when they handle lead bullets.

40. The most serious risk of exposure for humans is from accidental ingestion of lead shot pellets or lead bullet fragments in meat.  Health effects in human

beings following ingestion of whole lead shot pellets have been reported in many cases, and ingestion of meat tissues containing minute flakes or fragments of metallic lead from the passage of lead shot or lead bullet fragments through the tissues is also possible.

41. For example, in a highly publicized recent case, packets of venison shot with lead ammunition and donated by hunters to feed the hungry tested positive for lead contamination. Fifty-nine of 100 randomly sampled packages of meat had one or more visible lead fragments. Venison donation programs operate in all 50 states, and are estimated to provide a total of approximately 10 million meals.

42. Ammunition and sinker manufacturers now market a wide variety of non-lead, nontoxic bullets, shotgun pellets and fishing tackle that can replace lead projectiles and weights. There is no technological or commercial reason why nontoxic ammunition and fishing tackle with comparable effectiveness should not be substituted for their lead counterparts.

43. In fact, several states have mandated nontoxic shotgun ammunition for upland game bird hunting, and states in the Northeast have begun to require non-lead fishing weights and lures in an effort to protect loons and other wildlife. However, those states with only a partial ban, such as California's requirement for big game hunting with nontoxic ammunition within the eight-county range of California condors, continue to have high rates of lead poisoning in wildlife.

44. The EPA has long held that whenever a toxic substance customarily used in the manufacture of commercial products can be replaced by a nontoxic substitute, articles made of the toxic substance should be removed from the market. All shot and bullets and fishing sinkers containing lead could economically be replaced with effective, nontoxic alternatives.

**B. Petition to ban lead in shot, bullets, and fishing sinkers**

45. On August 3, 2010 Plaintiffs submitted to the EPA a petition requesting rulemaking to prohibit the manufacture, processing, and distribution of lead shot, bullets, and fishing sinkers under the TSCA.

46. The Petition presents strong evidence that lead shot, bullets, and sinkers pose an unreasonable risk to health and the environment and that the risk cannot be prevented through action under other federal laws.

47. The Petition identifies commercially available alternatives to lead rifle bullets, rimfire bullets, shotgun pellets, fishing sinkers, and jigs containing lead.  It acknowledges that not all products available in lead are currently available as nontoxic alternatives, but it also shows that the demonstrated technology indicates that all products could be produced in non-toxic alternatives within a short period of time if manufacturers are provided a transition period for expanding upon current designed and stocks of ammunition and fishing gear.

48. In an undated memo issued sometime after August 3, 2010, the EPA authorized the posting of a docket EPA-HQ-2010-0681, authorizing posting documents to the docket, and opened the docket for public comment from August 3 – October 31, 2010.  EPA did not publish a notice of this action in the Federal Register and did not notify Plaintiffs.

49. On August 18, 2010, the EPA sent Plaintiffs a letter confirming it received the Petition and stating that if it denied the Petition, it would publish the reasons for the denial in the Federal Register.

50. On August 27, 2010, the EPA sent a letter to the Plaintiffs stating it was denying "the first request," referring to Plaintiffs' request to regulate lead shot and bullets, citing a "lack of authority to regulate lead in bullets and shot under TSCA."

51. On August 30, 2010, the EPA changed the comment deadline from October 31, 2010, to September 15, 2010.  EPA did not publish a notice of this action in the Federal Register and did not notify Plaintiffs.

52. On September 24, 2010, the EPA published its reasons for the denial of the Plaintiffs' request to regulate lead bullets and shot in the Federal Register. *Lead Ammunition and Fishing Sinkers: Disposition of TSCA Section 21 Petition*, 75 Fed. Reg. 58377-58378 (Sept. 24, 2010).

53. On November 4, 2010 the EPA notified Plaintiffs it was denying the request to ban lead fishing sinkers, claiming the action is not necessary to protect against an unreasonable risk of injury to health or the environment, and that the Petition does not demonstrate that the action requested is the least burdensome alternative to adequately protect against the concerns.

54. On November 17, 2010, the EPA published notice of its denial of the request to ban lead fishing tackle in the Federal Register. *Lead Fishing Sinkers; Disposition of TSCA Section 21 Petition*, 75 Fed. Reg. 70246-70248 (Nov. 17, 2010).

## CAUSE OF ACTION

## (TSCA Citizen's Petition Denial)

55. Plaintiffs re-allege, as if fully set forth therein, each and every allegation contained in the preceding paragraphs.

56. As detailed above, the Petition provided a reasonable basis to conclude that the issuance of a rule to prevent the poisoning of wildlife by lead shot, bullets and fishing tackle is necessary to protect health and the environment against an unreasonable risk of injury. Also, as shown above, the EPA has the authority under TSCA to issue such a rule. The EPA wrongfully denied the Petition and failed to give any adequate reason for doing so.

57. TSCA provides that if a petitioner demonstrates to a court by a preponderance of evidence that there is reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or environment against an unreasonable risk of injury, then the court shall order the defendants to initiate the petitioned action. 15 U.S.C. § 2620(4)(B)(ii).

58. Therefore, Plaintiffs are entitled to a de novo judicial review of the TSCA Petition.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request relief as follows:

1. On the Claim for Relief, that the Court order the EPA to initiate the petitioned action, namely to develop and implement regulations to prevent poisoning of wildlife by spent lead shot, bullets and lead containing fishing tackle.

2. On the Claim for Relief, for costs incurred herein, including reasonable attorneys' fees; and

3. For all such other equitable or legal relief that the Court considers just and proper.

Respectfully submitted,

Dated: November 23, 2010         _____

William J. Snape, III (DC Bar No. 455266)
CENTER FOR BIOLOGICAL DIVERSITY
5268 Watson Street, NW
Washington, DC 20016
Telephone: 202-537-3458
Telephone: 202-536-9351
Facsimile: 415-436-9683
billsnape@earthlink.net

Jaclyn Lopez (Cal. Bar No. 258589) (*pro hac vice* pending)
Adam Keats (Cal. Bar No. 191157) (*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
351 California St., Suite 600
San Francisco, CA 94104
Telephone: 415-436-9682
Facsimile: 415-436-9683
jlopez@biologicaldiversity.org
akeats@biologicaldiversity.org